UNITED STATES DISTRICT COUR
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| PHILIP BOLER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No.: 2:17-cv-0303-JEO ) |
| BANK OF AMERICA, NA; and SPECIALIZED LOAN SERVICING, LLC, | ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION

This action arises out of the servicing of Plaintiff Philip Boler's mortgage loan by Defendants Bank of America NA ("BANA") and Specialized Loan Servicing, LLC ("SLS"). The only remaining claims[1] before the court[2] are for alleged violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 1201, *et seq*. Both Defendants filed motions for summary judgment on the remaining claims against them. (Docs. 59 & 62).[3] The motions have been

---

[1] The court dismissed all other claims in the complaint. (Doc. 40).

[2] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 16).

[3] All evidentiary citations refer to the document and page number provided by CM/ECF, the court's electronic document filing system, except for citations to depositions, which refer to the page number provided on the deposition transcript, and citations to affidavits, which refer to the paragraph number provided by the affidavit.

fully briefed (docs. 59, 62-64, 67-68, 73, 76), and are now ripe for decision. For the following reasons, both motions are due to be granted and this case dismissed with prejudice.

## I. STATEMENT OF RELEVANT FACTS[4]

Plaintiff moved to Birmingham in approximately 1997 and was employed by AmSouth Bank, first in collections and then as a financial sales representative. (Doc. 62-2 ("Boler Dep.") at 21-24). As a financial sales representative, Plaintiff opened checking and saving accounts, consumer and commercial loans,[5] CDs, money market accounts, and the like. (*Id*. at 25). He also facilitated mortgage applications. (*Id*. at 29). He remained at AmSouth until 2002 when he took a comparable position at Compass Bank in financial sales. (*Id*. at 26-27). Plaintiff remains employed at Compass Bank as a financial sales representative with the same general responsibilities. (*Id*. at 28).

### A. The 1st Avenue Property and Mortgage Loan

In 2004, Plaintiff purchased property located at 1521 1st Avenue West in Birmingham, Alabama, for $1,000.[6] (*Id*. at 50-52; Doc. 59-11 ("Loan App.") at 1).

---

[4] These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[5] Plaintiff was not involved in the underwriting of the loans. He facilitated the application process. (Boler Dep. at 27-28).

[6] It is unclear from the evidence where Plaintiff lived at the time he purchased the 1st Avenue property. Plaintiff testified he has lived at a Daniel Circle address since approximately 2007 or

Three years later, in 2007, Plaintiff applied for a mortgage loan for $50,000[7] on the 1st Avenue property. (Loan App.). The loan application contains a section asking how the "property will be" used and gives three choices for the applicant to select: primary residence, secondary residence or investment. (*Id*. at 1). The box next to "investment" is marked on the application. (*Id*.). The "purpose of the refinance" is stated as "home improvement." (*Id*.). The acknowledgment and agreement section states "this property will be occupied as indicated in this application" and that the information provided is true and correct. . . ." (*Id*. at 3). Additionally, the mortgage documents contain a 1-4 Family Rider, also entitled "Assignment of Rents," which is primarily used when a borrower purchases rental property and permits the lender to collect rent from the property if the borrower defaults on the loan.[8] (Doc. 59-12 at 18-19).

At the time he applied for the loan, Plaintiff owned at least three other properties. Plaintiff's primary residence was located at 900 Daniel Circle in Birmingham, Alabama. (Boler Dep. at 40; Doc. 59-3 at 3). He also owned property located at 2926 Avenue V in Birmingham, Alabama, and 1562 Gary

---

2008, (Boler Dep. at 40), and the loan application, dated January 30, 2007, lists Plaintiff's address as 900 Daniel Circle, (Loan App. at 1). Before Daniel Circle, Plaintiff testified he lived at 1226 Wentworth Road, presumably in Birmingham, Alabama. (Boler Dep. at 41).

[7] Although the mortgage was for $50,000, the loan documents indicate that Plaintiff received $46,369.32 because $3,630.68 went toward closing costs and other items. (Loan App. at 3).

[8] *See* "What is a Mortgage Rider?" https://homeguides.sfgate.com/mortgage-rider-8922.html (June 23, 2018).

Avenue in Fairfield, Alabama. (Boler Dep. at 41-44; Doc. 59-3 at 3). Plaintiff rented the Avenue V property and the Gary Avenue property is a commercial building he uses for storage.[9] (Boler Dep. at 42-44). Regarding the 1st Avenue property, Plaintiff testified at his deposition that his plan was to renovate the 1st Avenue property and move into it because it was bigger than his residence on Daniel Circle. (Boler Dep. at 46). He then planned to rent the Daniel Circle property. (*Id*.).

Plaintiff used a portion of the loan funds to update the 1st Avenue property. Plaintiff testified he spent approximately $14,550[10] in 2007 to make improvements such as replacing the windows and siding, replaced about half the roof shingles and some of the decking, replaced the hot water tank, and renovated the bathroom. (*Id*. at 73-83). He also purchased light fixtures and hardwood flooring, but he never installed the flooring. (*Id*. at 78-81). Plaintiff also used a portion of the loan funds "to consolidate some of [his] debt." (*Id*. at 84). Specifically, Plaintiff used $21,000 to $22,000 to consolidate or pay off other debts. (*Id*. at 85).

---

[9] Boler planned on renovating the building and renting it, but he did not. (Boler Dep. at 44).

[10] Boler's testimony is vague and full of approximations as to how much of the loan proceeds he spent on renovations to the property. (Boler Dep. at 73-83). There is no evidence in the form of receipts. Defense counsel characterized the total as "less than $20,000" on the renovations and Boler agreed. (*Id*. at 82-83). If the maximum amount Plaintiff testified to spending on each item is added, the total amounts to $14,550. (*Id*. at 73-83) ($1,600 on windows, $2,300 on siding, less than $5,000 on roofing, $2,800 on the bathroom, $2,000 on hardwood floors, $250 on the hot water tank, and $600 on light fixtures).

It is unclear where the remaining loan funds were spent. Plaintiff testified he "was using that to finish other stuff that came up" on the house, and he did some minor work in 2008 like installing molding, trim, and new doors, but stated that by 2009 he was not doing any real work on the house. (*Id*. at 86-90). In 2009, 2010 and 2011, Plaintiff visited the property once or twice every two weeks for two hours a visit "at the most" when he would do "little stuff" like "cut the grass, piddle around . . . ." (*Id*. at 90-92).

In September 2011, the property was condemned by the City of Birmingham. (Doc. 59-13 at 6). The City put a condemnation notice, printed on colored paper, on the front door of the property. (*Id*.). The condemnation sign stated the City deemed the property "unsafe" and the City prohibited its use or occupancy as of September 27, 2011. (*Id*.).

**B. Vandalism of the 1st Avenue House and the Insurance Claim**

Eight months after the house was condemned, on May 20, 2012, Plaintiff discovered the property had been vandalized. (Boler Dep. at 103-04). Plaintiff testified that he went to the property to cut the grass and discovered the windows, hot water tank, and AC unit were stolen, as well as the copper wiring. (*Id*. at 103). Plaintiff called the police and filed a police report regarding the vandalism. (*Id*. at 105-06). Although Plaintiff testified that he told the officer everything that was stolen from the property, the only thing listed in the report is damage to three

5

exterior windows, valued at $80.00, and also that "[t]he inside of the house appears to have been vandalized." (Do. 59-14 at 1-2). The police report notes the fact that the house had been condemned as of September 27, 2011. (*Id*. at 2). Plaintiff signed the police report affirming the information contained therein was correct to the best of his knowledge. (*Id*.).

Plaintiff then submitted a property insurance claim under a lender-placed insurance policy. (Boler Dep. at 118-19, 123-24). Plaintiff did not inform the insurance company that the property had been condemned eight months earlier. (*Id*. at 131). After a review of the property, the insurance adjustor estimated the total cost of repair at $12,252.50. (Doc. 59-5 at 11). After this amount was reduced for depreciation and Plaintiff's deductible, the total payment amount was $7,482.36. (*Id*.). The insurance company sent a check to SLS for $7,482.36 on June 22, 2012. (Doc. 59-5 at 21; Doc. 59-15).

In early July 2012, Plaintiff called SLS and requested payment of $11,000[11] in insurance proceeds. (Boler Dep. at 134). Pursuant to the mortgage, SLS requested information from Plaintiff before it would release the funds, including a signed contractor's bid for the work to be performed. (*Id*. at 134-36; Doc. 59-16). Plaintiff did not send SLS anything in response, but instead retained an attorney in connection with the claims funds. (Boler Dep. at 137-38). Plaintiff's attorney sent

---

[11] Plaintiff conceded at his deposition that this amount was incorrect and the amount of the proceeds was actually $7,482.36. (Boler Dep. at 134).

requests on his behalf throughout late 2012 and early 2013, but Plaintiff did not provide any of the documents required to release the funds. (*Id*. at 135-53). In April 2013, his attorney directed SLS to apply the claim funds to Plaintiff's unpaid principal balance; however, on December 4, 2014, Plaintiff requested SLS reverse this action and disburse the funds directly to him so he could complete repairs to his property. (*Id*. at 152-53; Doc. 59-17 at 10; Doc. 59-5 at 24). Plaintiff ultimately provided the contractor's bid in January 2015, and SLS mailed Plaintiff a check for $7,482.36, the full amount of the insurance proceeds, on April 22, 2015. (Boler Dep. at 153-55; Doc. 59-19 at 1).

After receipt of the insurance proceeds, Plaintiff did not perform any repairs to the 1st Avenue property. Instead, Plaintiff testified that the contractor wanted more money than originally quoted. (Boler Dep. at 164-65). Plaintiff decided to hold the check until he could "come up with more money" to complete the repairs. (*Id*. at 165).

### C. Demolition of the 1st Avenue House and Insurance Claim

On November 6, 2014, over three years after condemning the property, the City of Birmingham sent Plaintiff a letter to Plaintiff's home address[12] stating that it found the 1st Avenue house "to be unsafe or in a dangerous condition to the

---

[12] The home address is the Daniel Circle address.

extent that it is a public nuisance."[13]   (Doc. 59-5 at 26).   The letter informed Plaintiff that he needed to repair the building or have it demolished and if he did not the City would schedule demolition on December 9, 2014.  (*Id.*).  It also informed Plaintiff of his rights to a hearing.  (*Id.*).  On December 9, 2014, the City of Birmingham sent another letter to Plaintiff's home address advising him that it planned to demolish the 1st Avenue home.[14]  (Doc. 59-20 at 1).

The City sent another notice to Plaintiff eight months later, on July 31, 2015, stating that demolition bids were now being processed and any and all property needed to be removed.[15]  (Doc. 59-5 at 29; Doc. 59-21 at 2).  Upon receipt of this notice, Plaintiff went to the City and asked for all the documentation it had in its file. (Boler Dep. at 165-68).  Plaintiff told the person at the City that he did not want his property demolished and she told him that he needed to speak to his lender.  (*Id.*).  Plaintiff, however, did not do anything to resolve the issues with the property and stop the demolition.  (*Id.* at 169-70).  A demolition permit was issued on November 12, 2015, and the house on the property was demolished shortly thereafter.  (Doc. 59-22 at 1).

---

[13] Plaintiff testified he did not recall receiving this letter.  (Boler Dep. at 159).  The letter indicates it was sent via certified mail.  (Doc. 59-5 at 26).

[14] Plaintiff testified he did not receive the December 9, 2014 letter.  (Boler Dep. at 162-63).  The letter indicates it was sent via certified mail.  (Doc. 59-5 at 27; Doc. 59-20).

[15] Plaintiff admits he received the July 31, 2015 notice regarding demolition, but did nothing to prevent its occurrence.  (Boler Dep. at 163-64, 167; Doc. 59-5 at 28; Doc. 59-21 at 1).

On November 16, 2015, four days after the demolition, Plaintiff submitted an insurance claim for the property and identified the cause of loss as "Mysterious Disappearance." (Boler Dep. at 233; Doc. 59-23 at 1). Plaintiff testified that he "didn't know where the house – the house was gone." (Boler Dep. at 233). Even though he acknowledged receipt of communications from the City about demolition, he did not think the house had been demolished. (*Id*. at 233-34). The claim was denied because the City's demolition was not a covered loss. (*Id*. at 234; Doc. 59-24).

**D. Plaintiff's Letters to SLS**

On May 27, 2015, Plaintiff mailed thirteen (13) separate letters[16] to SLS via certified mail. (Boler Dep. at 93-95). The letters asked SLS to provide him with a variety of information, including, but not limited to, a payoff statement, loan transaction history, property inspection fees, loss mitigation options, loss mitigation applications, the pooling and servicing agreement, a reinstatement quote, whether SLS would foreclose, and why SLS held the insurance proceeds. (Docs. 59-25 – 59-37). Then, on July 29, 2015, Plaintiff mailed fifteen (15) more letters to SLS. (Doc. 59-46). Thirteen of the fifteen letters were identical to the letters dated May 27, 2015. (*See id*.). The two new letters disputed how SLS

---

[16] Plaintiff testified his attorney helped draft the letters he sent to SLS. (Boler Dep. at 94). He testified that he made the decision to send the letters separately because he had not been able to get a clear response from SLS when he called. (*Id*. at 94-95).

handled the insurance proceeds. (*Id.*). SLS transferred the servicing of the loan to BANA effective December 16, 2015. (Doc. 59-50).

Plaintiff continued to mail letters to SLS after the transfer. Plaintiff sent a letter to SLS on March 8, 2016, inquiring as to whether SLS force placed insurance on his property and information related to that insurance. (Doc. 59-51). Plaintiff mailed two additional letters to SLS on June 10, 2016; one asked for information about communications between SLS and the City of Birmingham and the other asserted SLS's statements to the City of Birmingham were in error.[17] (Doc. 59-53).

### E. Plaintiff's Letters to BANA

Plaintiff sent his first two letters to BANA on March 8, 2016.[18] (Docs. 62-10 & 62-11). The first letter requested a copy of his servicing file and the second requested information regarding force-placed insurance and demanded BANA refund the cost, fix his credit reporting and his account balance. (*Id.*). Plaintiff sent two additional letters to BANA on June 10, 2016. (Doc. 62-22 & Doc. 62-23). The first was a copy of the demolition report that BANA requested. (Doc. 62-22). The second letter acknowledged receipt of BANA's servicing file and requested explanations related to property inspections, boarding and yard

---

[17] Plaintiff resent both letters to SLS on August 2, 2016, but to a different address. (Doc. 59-55).

[18] As with the letters sent to SLS, Plaintiff testified his attorney wrote the letters, he signed them and mailed them. (Boler Dep. at 255).

maintenance. (Doc. 62-23). Plaintiff's loan was transferred back to SLS on December 16, 2016. (Doc. 62-26).

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleading depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying the portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id* at 323. Once the movant has met its initial burden, the non-moving party must go beyond the pleading and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue suitable for trial. *See id*. at 324; *see also* Fed. R. Civ. Pro. 56(e).

Substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences must be resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

**III. DISCUSSION**

Defendants argue that summary judgment is proper because RESPA does not apply to the loan at issue. (Doc. 59 at 18-21; Doc. 62 at 13-14; Doc. 73 at 6-10; Doc. 76 at 2-8). Specifically, Defendants contend that because the undisputed facts establish that the loan was primarily for investment purposes, it is not covered under RESPA.[19] (*Id.*). Plaintiff disagrees and argues that at the time he applied for the loan, he intended to renovate the property, move into it, and rent the Daniel Circle property. (Doc. 63 at 19-22; Doc. 67 at 22-27). As such, he contends the loan was for personal purposes and, as such, covered by RESPA.

Where there is a dispute as to the type of loan transaction, the burden is on plaintiff to show that the loan in question was obtained for personal, as opposed to business, purposes. *See, e.g., Hinchliffe v. Option One Mortg. Corp.,* 2009 WL 1708007, at *3 (E.D. Pa. June 16, 2009) ("[Plaintiff] has the burden of evidencing his intent and showing that the loan was entered into primarily for personal purposes, as opposed to financing his businesses."); *see also Macheda v. Household Fin. Realty Corp. of N.Y.,* 2009 WL 113474, at *5 (N.D.N.J. Jan. 15,

---

[19] Defendants raise other grounds in support of their motions for summary judgment. However, because this issues is dispositive of Plaintiff's claims, the court pretermits further discussion of those defenses.

2009) ("When there is a dispute between parties as to the type of transaction, '[t]he plaintiff has the burden of showing that the disputed transaction was a consumer credit transaction, not a business transaction.'" (quoting *Searles v. Clarion Mortg. Co.*, 1987 WL 61932, at *3 (E.D. Pa. Dec. 7, 1987))).

Congress enacted RESPA to protect consumers from abusive practices in mortgage closings. It is to be construed "liberally in order to best serve Congress's intent." *Ranger v. Wells Fargo Bank N.A.*, __ F. App'x __, 2018 WL 6523213 (11th Cir. Dec. 11, 2018) (quoting *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1244 (11th Cir. 2016)). However, RESPA does not "apply to credit transactions involving extensions of credit . . . primarily for business, commercial, or agricultural purposes . . . ." 12 U.S.C. § 2606(a).[20] The court must, therefore, decide the primary purpose of the loan to ensure that RESPA applies. The binding law in this Circuit instructs the court to examine the transaction as a whole and the purpose for which the credit was extended in determining whether a transaction is

---

[20] This language contained in RESPA is identical to the language in the Truth in Lending Act ("TILA"). *See* 15 U.S.C. § 1603(1). Congress explicitly instructed that implementing regulations ensure that the language in both statutes is treated identically, 12 U.S.C. § 2606(b); 24 C.F.R. § 3500.5(b)(2), and courts cite TILA and RESPA cases interchangeably with regard to this language. Additionally, the Fair Debt Collection Practices Act ("FDCPA") defines a "debt" as an obligation "to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes . . . ." 15 U.S.C. § 1692(a)(5). Because of the lack of case law in this area, courts refer to FDCPA cases when analyzing this RESPA language. The court follows suit and uses relevant RESPA, TILA and FDCPA cases in its analysis.

13

primarily consumer[21] or commercial in nature. *Tower v. Moss*, 625 F.2d 1161, 1166 (5th Cir.1980)[22] ("the nature of the credit transaction is ultimately determined by the entire surrounding factual circumstances"); *Poe v. First Nat'l. Bank of DeKalb County*, 597 F.2d 895, 896 (5th Cir. 1979) ("The courts will look to the purpose of the loan to determine whether it is covered by [TILA]"). Other courts follow suit and "look at the entire transaction and surrounding circumstances to determine a borrower's primary motive." *Krishtul v. VSLP United, LLC*, 2014 WL 940941, at *9 (E.D.N.Y. March 11, 2014) (quoting *Mauro v. Countrywide Home Loans, Inc.*, 727 F. Supp. 2d 145, 153 (E.D.N.Y. 2010); *see also Shames–Yeakel v. Citizens Fin. Bank*, 677 F. Supp. 2d 994, 1002 (N.D. Ill. 2009) ("In determining whether a particular transaction had a primarily consumer or business nature . . . , courts look to the entire surrounding factual circumstances."); *Hinchliffe*, 2009 WL 1708007, at *3 ("In order to determine whether the loan was primarily personal or commercial in nature, we must look at the entire transaction and determine the borrower's primary motive for seeking the loan." (citation omitted)); *Macheda*, 2009 WL 113474, at *5. "A court must look not at how a loan is eventually used but, rather, at the purpose of a loan . . . ." *Smith v. Russellville Prod. Credit Ass'n*,

---

[21] Consumer credit is secured for "personal, family, or household purposes." *See* 12 C.F.R. § 226.2(a)(12).

[22] Decisions of the old Fifth Circuit are binding precedent in this circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209–11 (11th Cir.1981) (en banc).

777 F.2d 1544, 1549 (11th Cir. 1985) (citing *Poe*, 597 F.2d at 896) (emphasis omitted).

The court stresses that the issue is not whether the purpose of a transaction is "either business or personal," but whether it is "<u>primarily</u> consumer or commercial." *Tower*, 625 F.2d at 1166 (emphasis added). Certainly a transaction may have mixed purposes, i.e., both personal and business, but "the mere fact that the transaction has some personal purpose does not automatically render it subject to the provisions" of the Act. *Gombosi v. Carteret Mortg.Corp.*, 894 F. Supp. 176, 180 (E.D. Pa. 1995) ("a reasonable jury could [not] conclude that the purpose of the [loan] was primarily personal [but i]nstead, the undisputed facts indicate that the primary purpose of the . . . loan was a business purpose."); *see also Bokros v. Assocs. Finance, Inc.,* 607 F. Supp. 869, 871-72 (N.D. Ill. 1984) (court found TILA inapplicable as a matter of law as the primary purpose of the loan was business or commercial even though the plaintiff used almost half of the proceeds to retire an existing residential mortgage, because over half of the proceeds were used to buy a truck for his business).

In the instant case, the totality of the circumstances establishes the loan was primarily for investment or commercial purposes. Significantly, the loan documents themselves evidence the investment purpose of the loan. The signed loan application clearly checks the box indicating that the "property will be" an

"investment" property. (Doc. 59-11 at 1). Further, the mortgage documents include a 1-4 Family Rider, entitled "Assignment of Rents", which is primarily used when a borrower purchases rental property and permits the lender to collect rent from the property if the borrower defaults on the loan. (Doc. 59-12 at 18-19). The investment designation on the loan application and the assignment of rents rider in the mortgage document weigh heavily in favor of a finding that the primary purpose of the loan was commercial.[23] *See Daniels v. SCME Mortg. Bankers, Inc.*, 680 F. Supp. 2d 1126, 1131 (C.D. Cal. 2010) (the designation on the lending documents as an "investment" property was a "significant deficiency" to Plaintiff's claim that the loan was for personal purposes).

Additionally, although Plaintiff testified that it was always his intent to renovate the 1st Avenue property and move into it once renovated, (Boler Dep. at 46), this testimony is insufficient to create a genuine issue of material fact as to the primary purpose of the loan because his contemporaneous actions, or lack thereof, clearly contradict this testimony. *See Johnson v. Niehus*, 491 F. App'x 945, 951 (11th Cir. 2012) (explaining that a district court is not obliged to credit the non-movant's self-serving evidence "which is blatantly contracted by the . . . record . . . [and] that no fair-minded jury could return a verdict for [the non-movant]"); *Vicks v. Knight*, 380 F. App'x 847, 852 (11th Cir. 2010) (explaining that summary

---

[23] This is particularly true in this case where right above the borrower's signature, the loan application provides that the borrower "understand[s] that it is a Federal Crime … to knowingly make any false statements concerning any of the above facts … under Title 18, United States Code, Section 1001, et seq." (Doc. 59-11 at 4).

16

judgment was appropriately granted because "a reasonable factfinder could not believe" the non-movant's assertions because they were "contradicted by all of the relevant evidence, with the exception of the [non-movant's] own affidavit"). Plaintiff bought the property in 2004 for $1,000 and owned it for approximately three years before he applied for the loan. (*Id*. at 51-52; Doc. 59-11 at 1). Once he received the loan, he used approximately $21,000 to $22,000 on old debts and spent approximately $14,550 on renovations to the 1st Avenue property. (Boler Dep. at 73-85). By the end of 2008, however, Plaintiff was not doing any work on the house and in 2009, 2010 and 2011, Plaintiff visited the property once or twice every two weeks for at most two hours and would do "little stuff" like "cut the grass, piddle around . . . ." (*Id*. at 90-92). The house was in such bad disrepair by September 2011, the property was condemned by the City of Birmingham. (Doc. 59-13 at 6). Notwithstanding the condemnation notice, Plaintiff did nothing to repair or reverse the City's condemnation for over four years[24] and the property was eventually demolished on or about November 12, 2015. (Doc. 59-22 at 1). In sum, the undisputed facts reveal no real effort on the part of Boler to improve the house to such a condition where he could live there as his permanent residence.

---

[24] The court notes that while the home was condemned, but before it was demolished, Plaintiff received over $7,000 in insurance proceeds, but he did not use any of the funds toward the property. (Boler Dep. at 164-65).

Plaintiff's reliance on *Friedman v. Maspeth Fed. Loan & Sav. Ass'n*, 30 F. Supp. 3d 183 (E.D.N.Y. 2014) is inapposite. In *Friedman*, the plaintiff purchased a single-family house for the purpose of allowing his daughter, son-in-law, and their children to live there. *Id*. at 187. On deciding a motion to dismiss, the district court concluded the plaintiff sufficiently alleged that the mortgage at issue was for family purposes because: (1) the plaintiff's primary occupation was not closely related to the acquisition; (2) other properties he owned were not business properties; (3) he was not heavily involved in the maintenance of the property while his daughter lived there; (4) he did not receive any income from the property; and (5) the size of the loan was appropriate for the property.[25] *Id*. at 191. The court disregarded the notation on the loan application that the property was an

---

[25] The court applied the following five factors in making this determination, known as the Regulation Z factors:

> A. The relationship of the borrower's primary occupation to the acquisition. The more closely related, the more likely it is to be business purpose.
>
> B. The degree to which the borrower will personally manage the acquisition. The more personal involvement there is, the more likely it is to be business purpose.
>
> C. The ratio of income from the acquisition to the total income of the borrower. The higher the ratio, the more likely it is to be business purpose.
>
> D. The size of the transaction. The larger the transaction, the more likely it is to be business purpose.
>
> E. The borrower's statement of purpose for the loan.

*Friedman*, 30 F. Supp. 3d at 190 (citing 12 C.F.R. § 226.3, Supp. I, Cmt. (3)(i)(A)-(E); *Mauro*, 727 F. Supp. 2d at 153; 54 A.L.R. Fed. 491 (1981)).

investment because, under the circumstances, it was the most reasonable choice on the application because he did not intend the property to be his primary or secondary residence – the only other choices on the application.[26] *Id*. at 193.

The facts of this case are easily distinguishable from those in *Friedman*. First, no one ever lived in the property from the time Plaintiff purchased it in 2004 until the time it was demolished in 2015. As discussed above, Plaintiff's actions with regard to the property certainly do not evidence any real prospect of him or anyone else ever occupying the property as a residence. Second, Plaintiff owned two other rental properties during the same time period and derived income from at least one of them. Plaintiff personally handled all the renovations as well as the

---

[26] Specifically, the court stated:

> Plaintiff did indicate on the loan application that the property was purchased as an "investment" …. But the loan application provides only three options to select for the purpose of the purchase: "primary residence"; "secondary residence"; and "investment". It was not his primary or secondary residence since he maintains that he intended to purchase the home for his children to live in without paying rent, not to make a profit…. Of the three available options, it was appropriate to select "investment" because he did not intend to reside there…. Under the circumstances, his understanding does not appear unreasonable. It is the statutory definition of what is residential or investment property that counts, not the selection on a limited form provided by the seller. This was, for statutory purposes, a residential mortgage.
>
> In this case, plaintiff's daughter lives in a separate home adjoining plaintiff's. She has received substantial financial assistance. Plaintiff may have many personal reasons for wishing to provide nearby housing for his children. The arrangement is conducive to maintaining a close-knit familial relationship with his children and grandchildren, and it may address a concern for his own care as he ages and may require assistance from younger generations. In many communities, extended families play a critical role in ensuring a stable and vibrant environment. …
>
> The fact that plaintiff has the means to buy a home for his child without seeking a profit from the purchase should not bar him from seeking relief under a federal statute designed to protect homeowners from abusive business practices.
>
> Plaintiff sufficiently pleads that the loan was obtained for consumer—that is, personal, family, or household—purposes.

*Friedman*, 30 F. Supp. 3d at 193 (record citations omitted).

maintenance to the property before it was demolished. Simply put, the evidence clearly shows that the primary purpose of the loan was not primarily consumer, but in fact was primarily commercial.

## IV. CONCLUSION

Because the court concludes Plaintiff's loan is not covered by RESPA, Defendants' motions for summary judgment (docs. 59 & 62) are due to be **GRANTED**. The court's ruling as to the character of Plaintiff's loan disposes of this case in its entirety. Thus, the other arguments raised by the parties' summary judgment motions are not addressed. A separate order will be entered.

**DATED** this 27th day of February, 2019.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge